IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-02381-BNB-MJW

FELIX A. DEJEAN, III, and
CAROLYNE DEJEAN,

Plaintiffs,

v.

COLLEN A. GROSZ, as Trustee of the Declaration of Trust for Benefit of Colleen A. Grosz, dated 8/11/1989,
TIMOTHY C. RODELL, an individual, and
MARJORIE M. RODELL, an individual,

Defendants.

---

**ORDER**

---

This matter arises on the following:

(1) **Defendants' Renewal Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) on the Grounds of *Res Judicata* (Claim Preclusion)** [Doc. #38, filed 05/03/2014] (the "Motion to Dismiss");

(2) The plaintiffs' **Motion to Strike Section "B" of Defendants' Reply, or in the Alternative, for Leave to File Sur-Reply** [Doc. #44, filed 07/22/2014] (the "Motion to Strike");

(3) **Plaintiffs' Motion for Summary Judgment and Memorandum of Law in Support** [Doc. #46, filed 08/14/2014] ("Plaintiffs' Motion"); and

(4) **Defendants' Motion for Summary Judgment** [Doc. #47, filed 08/14/2014] ("Defendants' Motion").

The Motion to Dismiss and the Motion to Strike are DENIED AS MOOT. The Plaintiffs' Motion is GRANTED as specified, and the Defendants' Motion is DENIED.

## I. STANDARD OF REVIEW

The defendants filed a Motion to Dismiss the Complaint on May 3, 2014 [Doc. #38]. On July 22, 2014, the plaintiffs filed a Motion to Strike [Doc. #44] a portion of the defendants' reply brief in support of the Motion to Dismiss. On August 14, 2014, the parties filed cross-motions for summary judgment [Docs. ## 46 and 47]. The parties' arguments on summary judgment subsume those made in the motion to dismiss, but are supported by evidence. As a matter of judicial economy, I will address the motions for summary judgment. The Motion to Dismiss and the Motion to Strike are denied as moot.

In ruling on the motions for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion, and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment shall be rendered "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential

element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion must then go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. Only admissible evidence may be considered when ruling on a motion for summary judgment. World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II. UNDISPUTED MATERIAL FACTS[1]

1. The DeJeans own real property at 215 East Midland Avenue, Aspen, Colorado 81611, known as Unit B of the Lake View Townhome Condominiums ("Unit B"), located in Pitkin County, Colorado. *Plaintiffs' Motion*, pp. 2-3, ¶ 1 and Ex. A; *Defendants' Response to Plaintiffs' Motion for Summary Judgment* [Doc. #50] ("Defendants' Response"), p. 3. The plaintiffs' interest in Unit B was acquired on June 20, 2000. *Defendants' Motion*, p. 4, ¶ 2; *Plaintiffs' Motion*, p. 4, ¶ 14 and Ex. L.

2. Defendant Colleen A. Grosz, as Trustee of the Declaration of Trust for the Benefit of Colleen A. Grosz, owns real property at 211 East Midland Avenue, Aspen, Colorado 81611, known as Unit A of the Lake View Townhome Condominiums ("Unit A"), located in Pitkin County, Colorado. *Plaintiffs' Motion*, p. 3, ¶ 2 and Ex. B; *Defendants' Response*, p. 3. Ms.

---

[1]The plaintiffs do not dispute any of the material facts set forth in the Defendants' Motion, nor do they assert any additional undisputed material facts in their response brief. *Response in Opposition to Defendants' Motion for Summary Judgment* [Doc. #49] ("Plaintiff's Response"). Except for facts relating to the marketability of Unit B, the defendants do not dispute the material facts set forth in the Plaintiffs' Motion. *Defendants' Response to Plaintiffs' Motion for Summary Judgment* [Doc. #50], p. 3.

Grosz's interest in Unit A was acquired from Theresa M. Hubbert Schiff on August 31, 1995. *Defendants' Motion*, p. 4, ¶ 4; *Plaintiffs' Motion*, p. 4, ¶ 13 and Ex. K.

3. Defendants Timothy C. Rodell and Marjorie M. Rodell own real property at 201 Midland Avenue, Aspen, Colorado 81611 (the "Rodell Parcel"), located in Pitkin County, Colorado. *Plaintiffs' Motion*, p. 3, ¶ 3 and Ex. 3; *Defendants' Response*, p. 3. The Rodell Parcel is immediately adjacent to Lot 5. *Defendants' Motion*, p. 5, ¶ 9. The Rodells' interest in the Rodell Parcel was acquired from Ms. Schiff on February 18, 1994. *Defendants' Motion*, p. 5, ¶ 8; *Plaintiffs' Motion*, p. 4, ¶ 12 and Ex. J.

4. Each of the parties' respective properties is located within the Promontory Subdivision, which was originally platted in 1957. *Plaintiffs' Motion*, p. 3, ¶ 4 and Ex. D; *Defendants' Response*, p. 3.

5. Units A and B are situated on a single parcel known as Lot 5 of the Promontory Subdivision ("Lot 5"). *Plaintiffs' Motion*, p. 3, ¶ 5 and Ex. E; *Defendants' Response*, p. 3. Units A and B comprise all of the units in a residential duplex structure located on Lot 5. *Defendants' Motion*, p. 4, ¶ 5.

6. Benedict Land and Cattle Company conveyed Lot 5 of the Promontory Subdivision to Robert Barnard by warranty deed recorded November 22, 1957, at Reception No. 105794 (the "1957 Benedict Deed"). *Plaintiffs' Motion*, p. 3, ¶ 6 and Ex. F; *Defendants' Response*, p. 3.

7. The 1957 Benedict Deed contains a restriction limiting development of Lot 5 to the construction of one detached single family dwelling (the "Single Family Dwelling Restriction"). *Plaintiffs' Motion*, p. 4, ¶ 7 and Ex. F; *Defendants' Response*, p. 3.

8. Despite the Single Family Dwelling Restriction, a multiple-family structure consisting of no fewer than two separate and distinct residences has existed on Lot 5 since at least 1979. *Plaintiffs' Motion*, p. 4, ¶ 8 and Ex. G; *Defendants' Response*, p. 3.

9. Lot 5 was officially subdivided as a condominium development by a declaration recorded November 1, 1979, at Reception No. 219224 ("Condominium Declaration"), which referenced a pre-existing multiple-family structure comprised of two units. *Plaintiffs' Motion*, p. 4, ¶ 9 and Ex. H; *Defendants' Response*, p. 3.

10. From August 1988 until February 1994, Lot 5 and the Rodell Parcel were jointly owned by Theresa M. Hubbert Schiff. *Plaintiffs' Motion*, p. 4, ¶ 10; *Defendants' Response*, p. 3.

11. Ms. Schiff redeveloped Lot 5, replacing the then existing multiple-family structure with the current multiple-family structure comprised of Units A and B. *Plaintiffs' Motion*, p. 4, ¶ 11 and Ex. I; *Defendants' Response*, p. 3.

12. When the plaintiffs purchased Unit B, they were not aware of the Single Family Dwelling Restriction. *Defendants' Motion*, p. 5, ¶ 13 and Ex. G, 84:9-11.

13. The defendants have never sought to enforce the Single Family Dwelling Restriction. *Defendants' Motion*, p. 5, ¶ 14.

14. For years, the DeJeans have actively attempted to sell Unit B, but despite 74 showings, they have been unable to secure a buyer due, in part, to the Single Family Dwelling Restriction.[2] *Plaintiff's Motion*, Ex. M.

---

[2]The defendants dispute the plaintiffs' facts concerning the marketability of Unit B, but they do not provide any evidence to create a material fact dispute. *Defendants' Response*, pp. 3-4.

15. The DeJeans' expert appraiser, David Clayton, has opined that the Single Family Dwelling Restriction has a detrimental impact on the value of Unit B in the approximate amount of $1,430,000.00. Id. at Ex. N.

16. In 2006, Ms. Grosz and the Rodells commenced an action in the District Court of Pitkin County, Colorado (the "State Action"), seeking to enforce a deed restriction against another neighbor, Milton Zale, Trustee of the Milton Zale Trust Dated December 18, 1980. *Defendants' Motion*, p. 6, ¶ 15 and Ex. I.

17. In the State Action, Mr. Zale filed counterclaims against Ms. Grosz and the Rodells. He also filed third-party claims against the DeJeans. *Defendants' Motion*, p. 6, ¶ 16 and Ex. J.

18. The DeJeans asserted counterclaims and cross-claims against Ms. Grosz and the Rodells, Mr. Zale, and others. Id. at ¶ 17 and Ex. K.

19. The DeJeans' asserted a single cause of action against Ms. Grosz and the Rodells in the State Action seeking a declaration that the Single Family Dwelling Restriction was not applicable to their property or Lot 5. Id. at ¶ 18 and Ex. K.

20. The DeJeans moved for partial summary judgment in the State Action on their declaratory judgment claim, arguing that the Single Family Dwelling Restriction is unenforceable under Colorado's adverse possession statute. By order dated May 21, 2009, the state court granted the DeJeans' motion for partial summary judgment and extinguished the Single Family Dwelling Restriction. Id. at ¶ 19 and Ex. L.

21. Ms. Grosz and the Rodells filed a motion for reconsideration of the May 21, 2009 order and also seeking summary judgment in their favor. By order dated July 16, 2010, the state court vacated its May 21, 2009 order and decided that the DeJeans were not entitled to judgment

based on adverse possession. Specifically, the state court said that the DeJeans could not claim adverse possession against Ms. Grosz in the absence of an ouster because the DeJeans and Ms. Grosz are tenants in common. The state court further held that the DeJeans could not claim adverse possession against the Rodells because the eighteen year limitation period for adverse possession had not been satisfied. Id. at p. 7, ¶ 20 and Ex. M.

22. In an order dated October 18, 2010, the state court denied a motion by the DeJeans to amend their counterclaims to add causes of action based on the statute of limitation, merger, estoppel, and changed circumstances. The state court concluded that the amendment would be futile, reasoning that the proposed claims "are affirmative defenses and cannot be pled as independent causes of action. The DeJeans have attempted to avoid this rule of law by framing them as statements under the Declaratory Judgment Act. If the Court would allow this, every defendant would plead their affirmative defenses as a claim for relief under the Declaratory Judgment Act. This would create a procedural nightmare." The DeJeans were permitted to pursue the theories as affirmative defenses. Id. at pp. 7-8, ¶ 21 and Ex. N.

23. On November 1, 2010, the state court entered an order on the parties' cross-motions for summary judgment. The state court permitted the DeJeans to proceed on their theory of changed circumstances, but found that genuine issues of material fact existed regarding that claim. The motions for summary judgment were denied. Id. at p. 8, ¶ 22 and Ex. O.

24. On June 14 and 15, 2011, the state court conducted a trial on the DeJeans' counterclaim for a declaration that the Single Family Dwelling Restriction should be terminated under the equitable doctrine of changed circumstances. On August 2, 2011, the court denied the

claim because the DeJeans did not satisfy all of the elements necessary to prove the claim. Id. at p. 9, ¶ 23 and Ex. P.

25. The DeJeans did not appeal any of the state court orders. Id. at p. 9, ¶ 24 and Ex. Q.

The DeJeans commenced this action on September 3, 2013. The Complaint asserts one claim for a declaration that the Single Family Dwelling Restriction is not enforceable against Unit B or Lot 5 based on theories of adverse possession, merger, estoppel, and laches. *Complaint*, pp. 3-4. The defendants challenge the plaintiffs' adverse possession theory and contend that--other than the plaintiffs' claim for adverse possession against the Rodells--every other theory must be dismissed as barred by the doctrine of res judicata. *Defendants' Motion*, p. 19.

Jurisdiction lies in this court based on diversity of citizenship under 28 U.S.C. § 1332(a).

## III. ANALYSIS

### A. Res Judicata

The Colorado Supreme Court has stated that it prefers the labels "claim preclusion" and "issue preclusion" over the traditional terms of res judicata and collateral estoppel because "res judicata is oftentimes used as an overarching label for both claim and issue preclusion" and "such usage may lead to confusion." Farmers High Line Canal & Reservoir Co. v. City of Golden, 975 P.2d 189, 196 n.11 (Colo. 1999). Accordingly, I analyze the parties' motions using the term claim preclusion instead of res judicata.

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City School District Board of Education, 465 U.S. 75, 81 (1984). Under Colorado law:

> [c]laim preclusion works to preclude the relitigation of matters that have already been decided as well as matters that could have been

> raised in a prior proceeding but were not. The doctrine protects litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. For a claim in a second judicial proceeding to be precluded by a previous judgment, there must exist: (1) finality of the first judgment, (2) identity of subject matter, (3) identity of claims for relief, and (4) identity or privity between parties to the actions.
>
> * * *
>
> In analyzing whether there exists identity of claims for relief, we have held that the inquiry does not focus on the specific claim asserted or the name given to the claim. Instead, the same claim or cause of action requirement is bounded by the injury for which relief is demanded, and not by the legal theory on which the person asserting the claim relies. In addition, claim preclusion also bars a litigant from splitting claims into separate actions because once judgment is entered in an action it extinguishes the plaintiff's claim including all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. Thus, claim preclusion bars relitigation not only of all claims actually decided, but of all claims that might have been decided if the claims are tied by the same injury.

Argus Real Estate, Inc. v. E-470 Public Highway Authority, 109 P.3d 604, 608-609 (Colo. 2005) (internal quotations and citations omitted).

Here, it is undisputed that the DeJeans filed a counterclaim against Ms. Grosz and the Rodells in the State Action for a declaration that the Single Family Dwelling Restriction is not enforceable against Unit B or Lot 5. *Defendants' Motion*, Ex. K. It is further undisputed that the state court denied the DeJeans' motion to amend their counterclaim to add the additional theories of merger and estoppel because those theories are affirmative defenses and cannot be pled as independent causes of action. Id. at Ex. N. The DeJeans do not dispute that they did not appeal any of the state court's orders.

The DeJeans seek the same relief in this court against the same parties based on the same subject matter and the same legal theories of merger and estoppel.[3] Pursuant to Argus, the DeJeans are precluded from reasserting in this court their claim for declaratory relief based on theories of merger, estoppel, and laches.

The DeJeans' claim for declaratory relief based on adverse possession is not barred by claim preclusion, however. "Colorado courts have held that a claim is not barred by principles of claim preclusion when the claim is not ripe or mature at the time the first case is pleaded." Argus, 109 P.3d at 614. The parties agree that the state court held that the adverse possession claim was not ripe as to the Rodells. *Defendants' Motion*, p. 19 n. 3 (stating that "Defendants recognize that Plaintiffs' adverse possession claim in the [State] Action against the Rodells was not dismissed on the merits but based on ripeness. That claim is therefore not *res judicata* . . . ."); *Plaintiffs' Response*, p. 17. See also Dash v. Rubey, 357 P.2d 81, 83 ( Colo. 1960) (stating that a judgment of dismissal is entitled to preclusive effect under the doctrine of claim preclusion only if it was on the merits). Specifically, the state court held:

> From 1988 to 1994, Lot 5 and Lot 7 were both owned by Theresa Schiff. The Rodells purchased Lot [7][4] in 1994. Since both Lot 5 and Lot 7 were once owned by a common owner, the statutory limitations period for adverse possession could not begin to run until the Rodells purchased Lot 7 in 1994. Consequently, the DeJeans are not entitled to summary judgment against the Rodells

---

[3]The DeJeans also seek relief under the theory of laches. *Complaint*, p. 4. Laches is an affirmative defense under Colo. R. Civ. P. 8(c). Laches is a form of estoppel. Western Motor Rebuilders, Inc. v. Carlson, 335 P.2d 272, 418.

[4]The court inadvertently stated that the Rodells purchased Lot 5 in 1994. However, it is undisputed that the DeJeans' and Ms. Grosz's property is on Lot 5. In addition, the record shows that the Rodells' property is situated primarily on Lot 7. *Defendants' Motion*, Ex. D.

> because the eighteen year statutory limitations period for adverse possession had not been satisfied. § 38-41-101, C.R.S.

The state court did not address ripeness as to Ms. Grosz. Ms. Grosz purchased her property on August 31, 1995--more than one year after the Rodells purchased their property. Therefore, the DeJeans' adverse possession claim was not ripe as to Ms. Grosz for the same reasons it was not ripe as against the Rodells. I am aware that the state court held that the DeJeans could not assert an adverse possession claim against Ms. Grosz absent an ouster because they were tenants in common in Lot 5. *Defendants' Motion*, Ex. M,, p. 2. However, because the DeJeans' adverse possession claim was not yet ripe as to Ms. Grosz, the state court's ruling regarding ouster is dicta, and the DeJeans may assert in this action their adverse possession theory against Ms. Grosz.

**B. Adverse Possession**

Section 38-41-101, C.R.S., governs claims for adverse possession in Colorado. The defendants argue that the statute does not provide a cause of action to terminate a deed restriction. *Defendants' Motion*, pp. 18-19. Specifically, they argue that section 38-41-101(1) "applies only to parties whose real property is adversely possessed by another"; it "does *not* create a separate cause of action for the benefit of an adverse possessor." Id. at p. 18 (emphasis in original).

State statutes are interpreted according to state rules of statutory construction. Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1190 (10th Cir. 2000). In addition:

> The goal of Colorado courts in "interpreting the meaning or scope of any statutory term . . . is to effectuate the intent of the legislature." People v. McCullough, 6 P.3d 774, 778 (Colo. 2000) (en banc) (citations omitted). "[W]e look first to the language of the statute itself to determine the legislative intent." Id. at 778.

> "Where the statutory language is clear and unambiguous on its face, there is no need to apply rules of statutory construction because it may be presumed that the legislature meant what it clearly said." In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 219, 999 P.2d 819, 820 (Colo. 2000) (en banc).

Id.

Section 38-41-101(1), C.R.S., provides:

> No person shall commence or maintain an action for the recovery of the title or possession or to enforce or establish any right or interest of or to real property or make an entry thereon unless commenced within eighteen years after the right to bring such action or make such entry has first accrued or within eighteen years after he or those from, by, or under whom he claims have been seized or possessed of the premises. Eighteen years' adverse possession of any land shall be conclusive evidence of absolute ownership.

The Colorado Supreme Court, in Matoush v. Lovingood, 177 P.3d 1262 (Colo. 2008), held that "the General Assembly has declared that the law of adverse possession extends to '*any* right or interest of or to real property'"; is not limited to "possessory interests such as title to land"; and may be utilized to terminate non-possessory interests in land. Id. at 1269 (original emphasis).

The defendants argue that even if section 38-41-101 provides a cause of action to terminate non-possessory property interests, the Single Family Dwelling Restriction is a building restriction, not a restriction on use, and is not terminable by prescription. *Defendants' Motion,* p. 11. The defendants assert that "[a]s a matter of law, the Single Family Restriction is not a 'right or interest' in real property. It is a covenant--a restriction imposed by deed running with the land, unrelated to ownership or possession." Id. at p. 12.

The defendants cite Double D Manor v. Evergreen Meadows Homeowners Ass'n, 773 P.2d 1046 (1989), in support of their argument. The court in Double D simply interpreted the language of a restrictive covenant. Adverse possession was not at issue.

The defendants rely on Matoush, 177 P.2d at 1271-75, to argue that the limitation period under the adverse possession statute does not start to run until they demand enforcement of the Single Family Dwelling Restriction. *Defendants' Motion*, p. 14. I disagree.

In Matoush, the Colorado high court considered when adversity arises for purposes of adverse possession in connection with the termination of an easement expressly created but never used. The court explained:

> When an easement is created by adverse possession, a party uses land that is not in his or her possession, and does so in a way that is adverse to the property rights of the party who possesses the land. In contrast, when an easement is terminated by adverse possession, a party uses land that is in his or her possession, but does so in a way that is adverse to the property rights of the easement holder who does not possess the land. In other words, because an easement does not dispossess the owner of the property burdened by the easement, the owner of the property burdened by the easement retains the right to use the property, including the easement area, in any way that is consistent with the easement holder's use of the easement.
>
> Because of this conceptual difference, a court's evaluation of the element of adversity will be different in a claim to terminate an easement by adverse possession than it is in a claim to create an easement by adverse possession. A claim to terminate an easement by adverse possession requires a stronger showing of adverse use than a claim to create an easement by adverse possession does. For instance, the element of adversity in a claim to terminate an easement by adverse possession requires more than a showing of possession of the easement area, which is usually sufficient to demonstrate adversity in a claim to create an easement by adverse possession.

> Only use that is incompatible or irreconcilable with the easement holder's authorized right of use will be sufficient to justify terminating an easement by adverse possession. Therefore, a party claiming to have terminated an easement by adverse possession must prove that the use interferes significantly enough with the easement owner's enjoyment of the easement to give notice that the easement is under threat. The challenge of a court's inquiry into the element of adversity is that there is no easily drawn definition of what use is adverse to an easement holder's rights. Thus, whether use of the easement area is an incompatible or irreconcilable use sufficiently adverse to trigger the statutorily-mandated period of time for adverse possession depends upon the circumstances of each case.

Matoush, 177 P.3d at 1270-71 (internal quotations and citations omitted).

The case at bar is factually distinguishable from Matoush. Here, I am confronted with a challenge to a covenant in a deed purporting to restrict the use of Lot 5 to "not more than one detached single family dwelling and outbuildings pertaining thereto . . . ," *Defendants' Motion*, Ex. F [Doc. # 47-6], not with the termination of an easement. I find that the construction and maintenance of "no fewer than two separate and distinct residences . . . on Lot 5 since at least 1979," see Undisputed Material Fact # 8 supra, in direct contravention of the Single Family Dwelling Restriction, is an "incompatible or irreconcilable use sufficiently adverse to trigger the statutorily-mandated period of time for adverse possession" within the contemplation of Matoush.

Finally, the defendants argue that in the case of a jointly-owned property, the party asserting adverse possession must prove ouster of a co-tenant in addition to proving the elements found in section 38-41-101. *Defendants' Motion*, p. 11. The defendants cite Fallon v. Davidson, 320 P.2d 976 (Colo. 1958), in support. The Fallon court described the issue before it as follows:

> Where title to real estate is held by tenants in common, and one of said tenants becomes a judgment debtor whose interest in the property is sold under execution; and where the sheriff's deed does not describe the fractional interest of the judgment debtor which

> was sold, but purports to convey the whole; can the grantee in said deed acquire full title by adverse possession as against the original tenants who shared the title with the judgment debtor?

Id. at 978.

The court determined that the sheriff's deed conveyed to the grantee only the fractional interest in the land which was owned by the judgment debtor; the grantee became a tenant in common with the owners of the remaining interest in the property; "possession of one co-tenant is possession of all"; and "[u]ntil an actual ouster of the co-tenants had been established by conduct apart from mere use and occupation of the land by the grantee, the statute giving rise to a claim of adverse possession did not begin to run." Id.

The Fallon court's analysis regarding ouster does not apply to the facts of this case. "An ouster, in the law of tenancy in common, is the wrongful dispossession or exclusion by one tenant in common of his cotenant or cotenants from the common property of which they are entitled to possession." Hed v. Pullara, 261 P.2d 509, 511 (Colo. 1953). This case involves a claim to extinguish a restrictive covenant, not a claim for possession of real property.

A restrictive covenant is a type of servitude. Restatement (Third) of Prop: Servitudes § 1.1 (2000).[5] The Restatement defines servitudes as follows:

> (1) A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land.
>
> > (a) Running with land means that the right or obligation passes automatically to successive owners

[5]Colorado courts look to the Restatement when resolving issues involving servitudes. See e.g. Lobato v, Taylor, 71 P.3d 938, 950 (Colo. 2002) (quoting § 2.8, cmt. b: "Servitudes that are not created by contract or conveyance include servitudes created by dedication, prescription, and estoppel.").

> or occupiers of the land or the interest in land with which the right or obligation runs.
>
> (b) A right that runs with land is called a "benefit" and the interest in land with which it runs may be called the "benefitted" or "dominant" estate.
>
> (c) An obligation that runs with land is called a "burden" and the interest in land with which it runs may be called the "burdened" or "servient" estate.

Id.

Servitudes are further described in the comments to § 1.1:

> "Servitude" is the generic term that describes legal devices private parties can use to create rights and obligations that run with land. Rights and obligations that run with land are useful because they create land-use arrangements that remain intact despite changes in ownership of the land. Servitudes permit the creation of neighborhoods restricted to particular uses . . . .

Id. at cmt a.

"To the extent that a use of property violates a servitude burdening the property and the use is maintained adversely to a person entitled to enforce the servitude for the prescriptive period, that person's beneficial interest in the servitude is modified or extinguished." Restatement (Third) of Prop: Servitudes § 7.7 (2000); cmt. b (noting that the primary application of section 7.7 is to easements and restrictive covenants). Section 7.7 of the Restatement is applicable "where the servient estate is used in a way that violates the obligation imposed by an affirmative covenant." Id. at cmt. b. See also Matoush, 177 P.3d at 1265 (acknowledging the technical difference between prescription and adverse possession as provided in the Restatement and "noting that although both doctrines permit acquisition of property rights through the passage of time, . . . prescription is applied to servitudes [non-possessory estates, such as easements] while adverse possession is applied to possessory estates," but for "clarity and consistency" the court

referred to the plaintiff's claim as one for termination of an easement by adverse possession) (citing Restatement (Third) of Prop: Servitudes § 2.17 cmt. a) (internal quotations omitted)).

"Prescription provides a mechanism for bringing to a close the right of a servitude beneficiary to seek redress for continuing violations by extinguishing the benefit." Id. at cmt. a. "Adverse uses meeting the requirements of §§ 2.16 and 2.17 that . . . violate covenants, if continued throughout the prescriptive period, extinguish the benefit of the servitude to the extent of the adverse use." Id. at cmt. b. Sections 2.16 and 2.17 of the Restatement require adverse use that is open and notorious and continued for the prescriptive period. Id. at §§ 2.16; 2.17. Although exclusive possession must be proved to acquire a property interest by adverse possession, to extinguish a servitude "the claimant is only required to use the property during the prescriptive period. The use need not be, and frequently is not, exclusive." Restatement (Third) of Prop: Servitudes § 2.17, cmt. a (2000); § 7.7, cmt. b (the requirements for extinguishing a servitude by prescription are the same as the requirements for creating a servitude by prescription found in sections 2.16 and 2.17 ). Therefore, ouster of a cotenant is not necessary to extinguish a servitude.

The prescriptive period in Colorado is eighteen years. Section 38-41-101, C.R.S.; Matoush, 177 P.3d at 1269; Lobato, 71 P.3d at 954. "The prescriptive period begins when a use that constitutes an actionable violation of the servitude occurs." Restatement (Third) of Prop: Servitudes § 7.7 (2000,) cmt. b.

The defendants do not dispute that a multiple-family structure consisting of no fewer than two separate and distinct residences has existed on Lot 5 since at least 1979. The maintenance of the duplex on Lot 5 violates the Single Family Dwelling Restriction in a way that is adverse to all

of the beneficiaries of the servitude.[6] Moreover, Lot 5 has been used openly and notoriously in violation of the Single Family Dwelling Restriction since at least 1979. See Id. at § 2.17, comt. h (stating that the open or notorious requirement is met when the use is "substantial and reasonably definite" so that the landowner(s) "should be aware that an adverse use is being made").

The Rodell Parcel and Lot 5 were both owned by Ms. Schiff from August 31, 1988, until February 18, 1994, when Ms. Schiff conveyed the Rodell Parcel. Ms. Schiff conveyed Unit A of Lot 5 to Ms. Grosz on August 31, 1995. Because one cannot adversely interfere with a right or interest in one's own property, the prescriptive period in this case could not begin until Ms. Schiff's common ownership of the property ended. Therefore, the prescriptive period began to run (1) against the Rodells on February 18, 1994, when common ownership between their property and Lot 5 terminated, and (2) against Ms. Grosz on August 31, 1995, when common ownership between Units A and B ended. The eighteen year limitation period lapsed against the Rodells' enforcement right on February 18, 2012, and against Ms. Grosz's enforcement right on August 31, 2013. This action was filed on September 3, 2013.[7] Thus, the DeJeans have met all of the requirements necessary to modify the Rodells' and Ms. Grosz's right to enforce the Single Family Dwelling Restriction against Lot 5. Specifically, the continuous adverse use of Lot 5 as a

---

[6]It is not apparent why the action was not brought to quiet title. See Zavislak v. Shipman, 362 P.2d 1053 (Colo. 1961)(affirming the trial court's order "removing the cloud" created by restrictive covenants concerning set back requirements based on changed circumstances and "quieting the title"). In the absence of an action to quiet title, judgment may enter only as to the parties to this action. I am informed, however, that "each and every other property owner within the Promontory Subdivision has expressly waived his or her right to file suit to enforce the Single Family Dwelling Restriction. . . ." *Response to Motion to Dismiss* [Doc. # 41] at p. 21.

[7]The defendants do not dispute this calculation of the prescriptive period. To the contrary, they argued only that the limitation period under the adverse possession statute does not start to run until they demand enforcement of the Single Family Dwelling Restriction.

duplex for the prescriptive period has resulted in a modification of the benefit of the restrictive covenant so that it no longer precludes the use of Lot 5 for a residential duplex structure. Restatement (Third) of Prop: Servitudes § 7.7 and cmt. b (the benefit of the servitude is extinguished to the extent of the adverse use).

"[T]he rationale for prescription is that it rewards the person who has made productive use of the land, it fulfills expectations fostered by long use, and it conforms titles to actual use of the property. The doctrine protects the expectations of purchasers and creditors who act on the basis of the apparent ownerships suggested by actual uses of the land." Restatement (Third) of Prop: Servitudes § 2.17, cmt c; § 7.7, cmt. a (stating that "[t]he rationale for extinguishing servitude benefits by prescription is the same as that for permitting their acquisition by prescription, which is set forth in §§ 2.16 and 2.17."). The Rodells and Ms. Grosz have never attempted to enforce the Single Family Dwelling Restriction. The DeJeans have been unable to sell Unit B, in part because of the Single Family Dwelling Restriction. The Single Family Dwelling Restriction is, in essence, a fiction in connection with Lot 5 because a duplex has existed on the property, unchallenged, since at least 1979. The law cannot support this fiction to the profound detriment of the DeJeans.

IT IS ORDERED:

(1) The Motion to Dismiss [Doc. #38] is DENIED AS MOOT;

(2) The Motion to Strike [Doc. #44] is DENIED AS MOOT;

(3) The Defendants' Motion is [Doc. #47] IS DENIED;

(4) The Plaintiffs' Motion [Doc. #46] is GRANTED as specified; and

(5) Judgment shall enter in favor of the DeJeans on their claim for declaratory relief as follows: The rights of the Rodells and Ms. Grosz to enforce the Benedict Single Family Dwelling Restriction with respect to Lot 5 is modified so that the benefit of the restrictive covenant does not preclude the use of Lot 5 for a residential duplex structure.

Dated October 29, 2014.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge